J-A28001-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ESTATE OF DOLORES C. DOUGHERTY, AND MARTIN DOUGHERTY | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : | |
| v. | : : : | No. 1161 EDA 2024 |
| DOLORES R. LAMB | : : | |

Appeal from the Judgment Entered May 29, 2024
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 220600821

BEFORE: PANELLA, P.J.E., STABILE, J., and NICHOLS, J.

MEMORANDUM BY PANELLA, P.J.E.: **FILED JANUARY 28, 2025**

Appellants, the Estate of Dolores C. Dougherty ("Mother Dougherty"), and Martin Dougherty, appeal from the judgment entered on May 29, 2024 following a non-jury trial regarding the transfer of money and property from Mother Dougherty to her daughter Dolores R. Lamb.[1] After our careful independent review, we affirm on the basis of the trial court's opinion.

_____

[1] Appellants filed a timely notice of appeal purporting to appeal from the order denying their motion for post-trial relief. "[A]n appeal properly lies from the entry of judgment, not from the denial of post-trial motions." **Croyle v. Dellape**, 832 A.2d 466, 470 (Pa. Super. 2003) (citation omitted). Because Appellants subsequently praeciped for entry of judgment, which was entered on the docket, the appeal is properly before us.

The trial court accurately summarized the factual and procedural history of the case. ***See*** Trial Court Opinion, 7/10/24, at 1-8. Therefore, a detailed recitation of the underlying facts is unnecessary.

The trial court considered Appellants' complaint, which was originally filed on June 8, 2022, and raised claims of breach of fiduciary duty (Count I), petition for accounting (Count II), conversion (Count III), and quiet title and fraudulent inducement (Count IV), in reference to the transfer of property and money from Mother Dougherty to Lamb. The complaint was later amended on July 18, 2022, in order to address preliminary objections filed by Lamb.

On February 2, 2024, following a non-jury trial, the court entered an order finding in favor of Appellants as to money given to Lamb by Mother Dougherty for investment purposes, and ordered the money be placed in an escrow account. Further, the court found in favor of Lamb in denying Appellants' request to void a November 9, 2020 deed, signed by both Mother Dougherty and Appellant Martin Dougherty, transferring the property in issue to Lamb. Following the court's denial of Appellants' post-trial motion, this timely appeal followed.

In a quiet title action, we are guided by the following principles:

> When reviewing an equitable decision, like a quiet-title action, our scope and standard of review are deferential. As this Court has explained:

> We will reverse only where the trial court was palpably erroneous, misapplied the law, or committed a manifest abuse of discretion. Where there are any apparently reasonable grounds for the trial court's decision, we must affirm it. Moreover, the function of this

- 2 -

Court on an appeal from an adjudication in equity is not to substitute our view for that of the lower tribunal; [we are] to determine whether a judicial mind, on due consideration of all the evidence, as a whole, could reasonably have reached the conclusion of that tribunal … when reviewing the results of a non-jury trial, we are bound by the trial court's findings of fact, unless those findings are not based on competent evidence.

*Calisto v. Rodgers*, 271 A.3d 877, 881 (Pa. Super. 2022) (*en banc*) (citation and footnote omitted).

Furthermore, we recognize:

Our review in a non-jury case is limited to whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. We must grant the court's findings of fact the same weight and effect as the verdict of a jury and, accordingly, may disturb the non-jury verdict only if the court's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial. It is not the role of an appellate court to pass on the credibility of witnesses; hence we will not substitute our judgment for that of the fact[-]finder. Thus, the test we apply is not whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion.

*Wolf v. Santiago,* 230 A.3d 394, 399–400 (Pa. Super. 2020) (citation omitted).

After reviewing the record, the parties' briefs, and the Honorable Gwendolyn N. Bright's well-reasoned Pa.R.A.P. 1925(a) opinion, we conclude Appellants' issues merit no relief. The trial court's decision belies Appellants' claims that the court committed multiple errors of law related to its admission, or prevention, of state of mind testimony, lack of jurisdiction, and its decision regarding the breach of fiduciary duty claim. In addressing Appellants' issues,

- 3 -

the July 10, 2024 opinion sets forth the evidence presented by both sides during this acrimonious litigation, and the relevant credibility issues at play, along with its credibility determinations. The court thoroughly addresses its decision to find in favor of Lamb regarding the November 9, 2020 deed, as well as its decision to find in favor of Appellants regarding placing the money given to Lamb by Mother Dougherty into an escrow account for the estate. *See* Trial Court Opinion, 7/10/24, at 9-22.

The trial court's opinion comprehensively disposes of Appellants' issues on appeal, with appropriate references to the record, and without legal error. Accordingly, we affirm on the basis of the trial court's comprehensive July 10, 2024 opinion.

Judgment affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/28/2025

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

ESTATE OF DOLORES C. DOUGHERTY, et al.

             v.

DOLORES LAMB.

: COURT OF COMMON PLEAS
: PHILADELPHIA COUNTY
:
: JUNE TERM, 2022
: NO. 00821
:
: SUPERIOR COURT OF PENNSYLVA
: 1161 EDA 2024

OPFLD-Dougherty Etal Vs Lamb

22060082100081

**OPINION**

G. BRIGHT, J.

This civil action to quiet title and for the reimbursement of monies entrusted to Appellee Dolores R. Lamb by her mother, the decedent, was initiated by Appellants on June 9, 2022. Initially, the mother, Dolores Dougherty (at times referred to hereinafter as "Mother," "Mom" or "Mother Dougherty") was a Plaintiff to this action, along with her son Martin Dougherty; unfortunately, Dolores Dougherty died on October 1, 2022. Thereafter, for this litigation the Estate of Dolores Dougherty was substituted for the decedent. The matter was then captioned as Plaintiffs "The Estate of Dolores Dougherty by and Through the Executors of the Estate, Martin Dougherty and Kathleen Dougherty, Individually." (Hereinafter, "Appellants," the children of the decedent, and Appellee's siblings).

This matter went to trial, non-jury, before the Honorable Gwendolyn Bright commencing on October 4, 2023 through October 6, 2023; and bifurcated at least twice to allow for additional evidence and briefing by the parties. On February 2, 2024 the Court entered an Order finding in favor of Appellants as to the return of the $74,751.00 to the Estate; and, in favor of Appellee

**00643**

regarding the real property located at 216 Jackson Street in Philadelphia. The specific Order is as follows:

AND NOW this 2nd day of February, 2024, after non-jury trial proceedings on October 4, 2023 through October 6, 2023, November 8, 2023 and December 18, 2023, along with numerous briefings by the parties, it is hereby ORDERED and DECREED that the Court finds as follows:

1. Find in favor of Plaintiffs, Estate of Dolores C. Dougherty, et al., and against Defendant, Dolores R. Lamb as to the $74, 751 given to Defendant by decedent, Dolores Dougherty for investment purposes. The $74, 751.00 and any interest currently attributed to that amount shall be placed in an escrow account for the Estate of Dolores C. Dougherty pending disposition orders of the Philadelphia Orphans' Court in the pending will contest action at No. 202300924 AP. Defense Counsel shall be responsible for creating and maintaining the escrow account pending disposition by the Orphan's Court.

2. Find in favor of the Defendant, Dolores R. Land, and against the Plaintiffs, Estate of Dolores C. Dougherty, et al., and **DENIES** Plaintiffs request to void the Deed dated November 9, 2020.

Post Trial Motions were filed by Appellants on February 13, 2024. Said Motions were denied without a hearing on March 28, 2024. This timely appeal followed on April 18, 2024.

2

**00644**

<u>**OVERVIEW**</u>

This litigation turned into a venomous dispute between siblings over their mother's property. Simultaneous with the instant quiet title action, Appellee filed an action, which remains pending, challenging Mother Dougherty's will, in Philadelphia County Orphans' Court. At issue in the instant action is the decedent's home, deeded to Appellee Lamb on November 9, 2020, and money entrusted to Lamb for investment.

To understand this litigation along with the credibility issues at play, one must have a firm grasp of the family dynamics and series of events over the course of many years. To say the least, the acrimony between the siblings is palpable. So palpable that during the remaining months of her life, Mother Dougherty and Appellee Lamb weren't speaking. Martin had threatened to call the police on an occasion when Appellee came to the home to speak with her mother; and when Mother was ill and died the siblings purposefully didn't inform Appellee of their mother's demise. N.T. 10/5/23 @ 81.[1]

The decedent was the mother of five children: Four daughters, Donna, Debbie, Kathleen and Appellee Dolores Lamb (the oldest child) and Appellant Martin Dougherty (the middle child and only son). N.T. 10/4/23 @ 106. Mother Dougherty raised all of her children, along with her husband until he died in 2007, at the property in question.

Appellee left the Jackson Street Address in 1967, when at age nineteen she got married. N.T. 10/6/23 @ 17. The other daughters followed suit, and from 2001 until Mother Dougherty's death in 2022, Appellant Martin Dougherty lived with his mother on Jackson Street. N.T. 10/4/23 @ 107; N.T. 10/5/23 @44 to 47. For Martin, a former drug addict (clean since 1994), residing with his mother was necessitated because of his inability to work because of disability,

---

[1] N.T. followed by the date and page refers to the Notes of Testimony from trial and proceedings before the Honorable Gwendolyn Bright in this action.

**00645**

and his limited income. N.T. 10/4/23 @ 109. The sole source of income for Mr. Dougherty was social security and Medicare. *Id.* @ 110. In addition to physical disability Martin suffers from depression. *Id.*

By all accounts in her later years, the decedent's day to day care fell to Martin Dougherty. He cooked, cleaned, attended to the decedent's personal hygiene, did the laundry, and ran errands. N.T. 10/4/23 @ 106-108. The daughters, including Appellee, did little to contribute to the hands-on tasks of caring for their elderly mother. *Id.* At 108-109.

The elder Dougherty's estate planning began around 2007. A series of wills, deeds and powers of attorney were to follow up until her 2022 death. This Court's concern of course is only as to the 2020 deed and roughly $75,000 entrusted from the mother to Appellee for investment purposes.

The following chronology of estate planning took place before, and after the 2020 documents at issue.

1. <u>2007</u>:

Apparently Dolores Dougherty did some estate planning in 2007; however, there was no testimony as to the provisions. N.T. 10/5/23 @ 43. There was testimony that the 2007 will caused friction between the siblings over the property, especially between Martin and sister Donna who was concerned Martin would inherit the property. The animosity was fueled by Martin's positioning himself as the one at home with Mom. N.T. 10/5/23 @43-44.

2. <u>2012</u>:

In 2012 Mother Dougherty sought Appellee's help in finding an attorney to reverse her will. Upon recommendation of Appellee's financial planner, Lamb made an appointment with Harvey Yanks, Esquire. Martin, Appellee and her husband James were present for discussion

4

**00646**

with Yanks. *Id.* @ 47-49. On April 13, 2012 the will conveyed the Jackson Street property to Appellee. Also on that date Appellee received durable power of attorney over her mother's affairs. Lamb speculated that one of the reasons her mother gave the property to her was because she had defended her mother against abusive treatment by Lamb's father. N.T. 10/6/23 @ 27-28. Martin dougherty was a witness to the signing of both documents. N.T. 10/6/23 @ 24-27.

3. 2019:

On August 13, 2019 Mother Dougherty signed a deed conveying the Jackson Street property to herself with a life estate for Martin. A new will was also prepared. N.T. 10/5/23 @ 38-40. The documents were prepared by Attorney Michael Bomstein who was recommended by daughter Kathleen. Bomstein had represented Kathleen previously. *Id.* @ 49. Present for the estate planning: Kathleen and Martin. *Id.* @ 51-55. The Bomstein documents and provisions therein were prompted to accommodate Martin's concerns about the impact on his social security benefits which commenced in 2018. Therefore, a provision of the 2018 will created a trust for Martin with sister Kathleen as the trustee. *Id.* @ 50, 57-60. Likewise, in the 2019 will Martin was bequeathed a 40 percent share of the mother's estate, with 60 percent to be split in equal shares among the four daughters. N.T. 10/6/23 @ 73-74. N.T. 10/4/23 @ 125-126. Martin was present with his mother in all of the Bomstein meetings, and even had discussions with the attorney about the terms of the documents. N.T. 10/5/23 @ 58. Appellee was not privy to the Bomstein meetings and the 8/13/19 documents until late June, 2020, nearly nine months later. *Id.*; N.T. 10/6/23 @ 62.

4. 2020:

5

In 2020, Mother Dougherty's deed was changed, transferring the property to Lamb; and her retirement funds were transferred to Appellee for investment. A power of attorney was also drafted. It is the 2020 deed, along with the investment funds that are the subject of the litigation.

A. Deed:

According to Appellee, she became aware of the 2019 Bomstein deed with her mother's blurt out during a phone call that " I changed the will. I didn't want to do it, but Marty kept hounding me. Did you say you would bury me in new Jersey?" *Id. @* 63. Thereafter, discussions took place between Mother Dougherty, Martin and Appellee about the 2019 documents. *Id. @* 64-70. These discussions centered around undoing what occurred in 2019, [which, according to Martin, once again concerned his well-being and financial benefits. *Id. @* 66-67.

Martin Dougherty's portrayal of the events surrounding the 2020 deed commences with a hysterical phone call from Lamb after she found out about the 2019 documents. N.T. 10/4/23 @ 128. Martin testified about discussions with Appellee which caused him to distrust Kathleen, and into thinking the Bomstein documents needed to be redone, otherwise his benefits would be in jeopardy. *Id. @* 129-132. It was as a result of these conversations that, Martin testified, he and Mother Dougherty became upset and were persuaded by Lamb to return to Attorney Yanks for a redo of the estate planning. *Id. @* 132.

Several months passed, and on October 27, 2020 a new will was signed, followed by a deed dated November 9, 2020 conveying Jackson Street from Dolores and Martin Dougherty to Dolores Lamb. N.T. 10/5/23 @ 40-41. At the time the 2020 document was signed, Mother Dougherty was suffering with a number of physical ailments, along with an extended bout with painful shingles on her back. N.T. 10/4/23 @ 137-146. Nothing in the evidence of this case credibly suggests that the decedent's mental capacity was impaired during this time.

6

**00648**

B. <u>The Money</u>:

In 2020 Appellee and her mother owned a joint bank account at Citizens Bank which held Mother Dougherty's $74,641 retirement money. N.T. 10/6/23 @ 42-43. In August, 2020 concerns about suspected fraud prompted Mother Dougherty to restructure her banking affairs and transfer the bulk of her money to Lamb for investment. *Id.* At 43-45, 99-100.

5. <u>2021</u>:

On May 10, 2021 Mother Dougherty received a letter from the City of Philadelphia Department of Records pertaining to the 2020 deed. It was then, that Martin claims he and his mother learned that the Jackson Street property had been conveyed to Appellee and they were both upset. N.T. 10/4/23 @ 158; N.T. 10/5/23 @ 6-12. Martin engaged in a series of phone calls, and visits to City offices pertaining to the 2020 deed. *Id.* Shortly after the receipt of the letter from the City, Dolores and James Lamb came to Mother's home, where according to Martin, the decedent wanted the home and money back. *Id.* @ 13. Shortly thereafter, Martin and his mother contracted the Senior Law Center and eventually connected with the Center's staff attorney, Lucy Qui. *Id.* @ 15-23. On February 9, 2022 Attorney Qui sent a demand letter to Appellee for the property and money. N.T. 10/4/23 @ 54.

6. <u>2022</u>:

In 2022 Attorney Qui prepared a new will and power of attorney for Dolores Dougherty. *Id.* @ 59. Once again, if not present with his mother, during estate planning discussions with Qui, Martin was close by. *Id.* @ 62-63. The Qui documents were executed in April, 2022. *Id.* @ 59.

Prior to the 2022 Qui consultations the litigants' sister Kathleen learned about the 2020 deed; this was sometime in the later part of 2021. N.T. 10/5/23 @ 113. Kathleen insisted that the

7

other siblings be informed, and ultimately contacted them herself. *Id.* @ 114-115. The siblings, to the exclusion of Appellee, had a series of discussions with their mother about the estate. *Id.* @ 115, 125-128. According to Kathleen there were 10 to 15 such discussions over a year and a half. *Id.* @ 126.[2] During their discussions the decedent believed there could be an amicable resolution with Appellee. *Id.* @ 116, 126. At this juncture an amicable resolution was most likely impossible as the siblings on both sides were firmly entrenched in their refusal to engage in contact, and their anger. *Id.* @ 126-128.

This is the toxic environment that surrounded the crafting of the Qui estate documents. Despite, that according to Qui, the decedent's intention with the 2022 will was to divide her estate equally among her five children, Qui suggested that since the Jackson Street property was deeded to Appellee, and she had the money, Appellee should be excluded from the April 29, 2022 will. N.T. 10/4/23 @ 60-62. According to Kathleen, "…My understanding was that as of the day that this will was implemented, our mother, in Lucy Qui's office, stated that up until that morning she was still going to include Dolores Lamb in that will." N.T. 10/5/23 @ 122. Ultimately Dolores Dougherty was persuaded by Qui's, bulk of the estate already in Lamb's hands argument, and Lamb was excluded from the 2022 will. *Id.* @ 122-123; N.T. 10/4/23 @ 60-62. Kathleen and Martin were appointed executors of the estate. *Id.* @ 61.

In addition to the will, Attorney Qui prepared documents reworking Lamb's power of attorney. A new healthcare power of attorney was crafted appointing Kathleen. N.T. 10/5/23 @ 119-120; N.T. 10/4/23 @ 59.

---

[2] The year and a half timeline appears off given the dates testified to. However, the discussions to the exclusion of Appellee were many, and did occur over an extended period of time.

**00650**

## DISCUSSION

Credibility issues, key to this case: This court cannot opine that the credibility of Appellee was outweighed by Appellants' evidence which was peppered by the self-serving interests of Appellant Martin Dougherty. Over the course of three trial days in October, 2023 and several bifurcated trial days later in 2023 the Court was able to assess the credibility of the evidence, particularly as to the testimony of the rival, sibling litigants. At the conclusion, the Court was left to ponder whose estate planning, whose intentions were paramount. The decedent's, Dolores Dougherty's, or those of her son Martin Dougherty.

Dolores Dougherty had five children: One son and four daughters. All of the daughters left home to pursue their respective lives, while from 2001 until her death Martin Dougherty lived with their mother. N.T. 10/4/23 @ 107. It was just the two of them. *Id.* The daughters checked in with mom infrequently, and were not privy to the day to day interactions, conversations and arguments between mother and son. There is no doubt that Martin was of service to his mother, particularly in her elder years in this apparent co-dependent relationship. It is equally clear that Marten listened in on and interjected into the decedent's telephone calls, read her mail, attended all of her estate planning consultations; and, overall, made it crystal clear to all, what he considered to be in his best interests. That applies as well to the 2020 deed, which is the subject of this litigation.

Dolores Dougherty's estate planning journey includes four to five wills (2007, 2012, 2019, 2020 and 22022), and two deeds (2019, 2020). Each of the documents was influenced either directly or circumstantially by the influences centering around Martin. The discord and animosity generated by Martin Dougherty's impact upon their mother's estate planning among the siblings dates back to at least 2007: In 2007 Martin was concerned that he would be homeless

9

**00651**

when Mother died, and at least one sibling, Donna did not want him to get the house. At that time Martin was a little over ten years out of his drug addiction. *Id.* @ 43-44.

## A. Evidentiary Issues:

### I. Dolores Dougherty's State of Mind

Appellants claim trial court error and abuse of discretion by precluding "state of mind testimony" by Lucy Qui, Esquire, and Dr. Rita Carabello. Conversely, Appellants purport error because they claim Appellee was permitted to testify about her mother's mental capacity. Thus, asserting that Appellants were prejudiced. These accusations of error are quite simply baseless, and belied by the record.

As to Attorney Qui (the preparer of the 2022 documents), Appellants' counsel inquired specifically as to mental capacity without objection, and the following transpired:

Q: Did you have occasion to...what was your impression of Ms. Dougherty's capacity with regard to this document?

A: ...I had conversations with Ms. Dougherty prior to execution, and she was very clear that she wanted to rework the Power of Attorney. She was very clear that she wanted to do a new Power of Attorney, a new Healthcare Power of Attorney and a new will...

N.T. 10/4/23 @ 59.

Earlier in Qui's testimony there was an objection as to what the attorney "felt" about influence, and generally about "capacity." *Id.* @ 51. These objections were sustained with the Court clarifying that the witness was permitted to testify about what she observed. *Id.* Qui went on to testify that Dolores Dougherty was "clear-minded," "oriented as to location and time,"

10

**00652**

"understood why it is that she was in office, "discussed the issue," "knew that it was her attorney, what I had offered to do for her, what the issue was…and her options," "she was not confused," "did not have trouble understanding me," and "knew exactly what was going on." *Id.* @ 52. Attorney Qui was not precluded from, and in fact did testify about the observations and opinions about Dolores Dougherty's mental capacity in 2022. Clearly there was not prejudice to Appellant. To claim error in this regard is quite frankly disingenuous.

Equally disingenuous and not supported by the record is the same claim as to the testimony of Doctor Carabello who treated Dolores Dougherty for shingles during the timeframe of the issue, the 2020 deed. *Id.* @ 71-73. The doctor described what shingles is, how it affects nerve endings, creating a painful rash. *Id.* Carabello testified about the pain that Dolores was suffering, and that her patient was uncomfortable. *Id.* @ 74. After the doctor was asked "Can a case of shingles that you observed in Ms. Dougherty affect a person's mental condition?" Carabello responded "I am not a psychiatrist. I would think the pain…" *Id.* @ 75. This was what was objected to and sustained. As with Attorney Qui, the doctor was permitted to respond to the following question "…what was your observations as far as her mental condition from her ailments?" *Id.* @ 77. The response: "She was definitely in a lot of pain and I felt that she was very uncomfortable there. However, I have it documented in my note that she was oriented…She was oriented…" *Id.* While the Court sustained the objection to the question "when a person is suffering from an extreme case of shingles should they be making life-affecting decisions, Appellants' counsel chose not to rephrase and/or ask any more questions. *Id.* @ 77. Interestingly, without objection, Appellee's counsel on cross received positive response from the doctor that her patient was mentally active, responded to questions, and, did so appropriately and intelligently. *Id.* @ 78. There was no redirect. *Id.* There was no prejudice to Appellant, and error was not committed.

11

**00653**

Next Appellants claim that Appellee was permitted to testify her observations of, and interaction with her mother on March 25, 2021 and prior thereto. N.T. 10/6/23 @ 46-47. Lamb testified that her mother: initiated conversation about current events, interacted with her normally, speech or conduct didn't raise concerns about mental weakness/defect. *Id.* @ 47. Appellants' counsel objected, but in the same breath, withdrew his objection. *Id.* When Appellee's counsel inquired about Dolores Dougherty's physical ailment and any observation of impact on mental acuity, the objection was overruled. *Id.* @ 48-49. Lamb responded regarding her observation as to one phone call in January 2022 where her mother "had quite a few incidents mixed up and mistaken." *Id.* @ 48-52. In contrast, Martin Dougherty was permitted such testimony as "…Your Honor, when it came to money with my mother, she knew. Her mind was razer sharp. And, no, I didn't do that and I wouldn't do that." N.T. 10/4/23 @ 125-126. There was no prejudice to Appellants. The claim of favoritism toward Lamb is offensive, unsupported in fact and by the record; and is meritless.

II. Doctor Carabello's Notes and Records

At trial, an issue was raised as to the doctor referring to records/notes that had not been shared with Appellee's counsel in a timely fashion: Significantly, only supplied the afternoon prior to trial. *Id.* @ 69-71. The Court sustained the objection to their use because of the untimeliness and Appellants' counsel's response was "fair enough." The issue is really moot and inconsequential since the doctor testified "I don't need them." *Id.* @ 70.

III. Cross-Examination of Appellee Dolores Lamb

Appellants claim the Court erroneously limited the cross-examination of Appellee lamb. How and where in the transcript reflects such limitation is not shared with the Court. Lamb's testimony took up most of the trial time on October 6, 0223. The notes of testimony from that

12

**00654**

day show that her testimony is recorded at page 54 through 135 (pages 13-53 on direct; and, pages 54-128 on cross; and 131-135 on re-cross). N.T. 10/6/23 @ 15-135. Many objections to questions on cross were overruled; and, other than sustaining objections to repetitive questions, and directions to rephrase a question, Appellant's counsel was afforded lengthy and ample opportunity for Lamb's cross-examination. *Id.* This is simply a meritless, fishing for issues, non-issue. There was no prejudice to Appellant. No error was committed.

## IV. Yanks Deposition

Here, Appellant challenge the allowance at trial of Attorney Harvey Yanks' deposition testimony, and denial by the Court to charge itself an adverse inference for Yanks' failure to appear. Moreover, Appellants attempts to jump into the mind of the Court claiming the Court "relied heavily on his non-trial testimony in reaching a verdict" (Appellants' Statement of Matters, page 3, section IV); which is simply not accurate. Error was not committed.

Attorney Yanks' video deposition was taken February 15, 2023. N.T. 10/6/23 @ 220. Appellants had an opportunity to cross-examine Yanks at that deposition. The Yanks video deposition was read into evidence at trial, over this objection of Appellants' counsel. *Id.* @ 135-220. Attorney Yanks prepared the 2020 deed which is at issue.

Appellee issued a subpoena for Attorney Yanks to appear at trial. Several efforts were made in that regard, including taping a subpoena to his office door. *Id.* @ 141. Yanks, an elderly attorney who had been in practice for over fifty years failed to appear at trial. The Court permitted the reading of the deposition at trial. *Id.* @ 153. The Court rejected Appellants' request that the Court, sitting non-jury, give itself an adverse inference charge, when assessing Yanks' testimony. *Id.* @ 223-226. Appellants' counsel conceded that such a charge was not required. *Id.*

Pa. R.C.P. 4020 (Use of Deposition at Trial) provides in pertinent part at section (a)(3):

13

**00655**

(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds

    (a) that the witness is dead, or

    (b) that the witness is at a greater distance than one hundred miles from the place of trial or is outside the Commonwealth, unless it appears that the absence of the witness was procured by the party offering the deposition, or

    (c) that the witness is unable to attend or testify because of age, sickness, infirmity or imprisonment, or

    (d) that the party offering the deposition has been unable to procure the attendance of the witness by subpoena, or

    (e) upon application and notice that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.

Here, the Court was satisfied with the efforts put forth by Appellee to serve the witness. *Id. @* 141-145. Yanks' deposition testimony was properly allowed, and an adverse inference instruction was neither necessary nor required.

V.    Fiduciary Duty/Power of Attorney

The history of Dolores Dougherty's estate planning dates back to 2007; and, significantly herein, to 2012 when she changed her 2007 will and appointed her daughter Dolores Lamb, power of attorney. Appellant Martin was, as throughout, present when both documents were signed on April 13, 2012 serving as a witness. N.T. 10/6/29 @ 25-27; N.T. 10/4/23 @ 116-118.

No one had a problem with the 2012 documents until 2018 when Martin started receiving social security benefits, and when in 2019 he, along with his mother went to see Attorney Bomstein. According to Martin "the reason we went to see Mr. Bomstein was because I was

14

**00656**

worried about…due to the limited amount of money I get and I spoke to my mother about it, not having a place to live. (Emphasis added). *Id.* @ 118. Motivated by what Martin wanted a new will and a deed were prepared by Attorney Bomstein. *Id.* @ 81-86. As to the deed, Bomstein recalled "it was an unusual deed because it included a request to do a life estate." *Id.* @ 81. The will was also unusual to Bomstein. *Id.* @ 85. In sum, both documents provided significantly for and addressed the concerns initiated by Martin. Lamb was excluded from meetings with Bomstein.

The Bomstein documents were dated August 13, 2019. Appellee found out about them several months later during a phone call when her mother told her "I changed the will. I didn't want to do it, but Marty kept hounding me. Did you say you would bury me in New Jersey?" N.T. 10/6/23 @ 62-63. A credible account when viewed against the totality of the evidence presented, along with Martin Dougherty's testimony that it was his concern regarding limited income and possible homelessness that initiated his mother's will change in 2019.

If the 2020 Yanks deed was the result of a fiduciary relationship 20 Pa. C.S.A. § 5601 would apply. Section 5601.3 (Agent's Duties) states:

(a) General rule.--Notwithstanding any provision in the power of attorney, an agent that has accepted appointment shall:

(1) Act in accordance with the principal's reasonable expectations to the extent actually known by the agent and, otherwise, in the principal's best interest.

(2) Act in good faith.

(3) Act only within the scope of authority granted in the power of attorney.

(b) Other duties.--Except as otherwise provided in the power of attorney, an agent that has accepted appointment shall:

(1) Act loyally for the principal's benefit.

15

**00657**

(1.1) Keep the agent's funds separate from the principal's funds unless:

    (i) the funds were not kept separate as of the date of the execution of the power of attorney; or

    (ii) the principal commingles the funds after the date of the execution of the power of attorney and the agent is the principal's spouse.

(2) Act so as not to create a conflict of interest that impairs the agent's ability to act impartially in the principal's best interest.

(3) Act with the care, competence and diligence ordinarily exercised by agents in similar circumstances.

(4) Keep a record of all receipts, disbursements and transactions made on behalf of the principal.

(5) Cooperate with a person who has authority to make health care decisions for the principal to carry out the principal's reasonable expectations to the extent actually known by the agent and, otherwise, act in the principal's best interest.

(6) Attempt to preserve the principal's estate plan, to the extent actually known by the agent, if preserving the plan is consistent with the principal's best interest based on all relevant factors, including:

    (i) The value and nature of the principal's property.

    (ii) The principal's foreseeable obligations and need for maintenance.

    (iii) Minimization of taxes, including income, estate, inheritance, generation-skipping transfer and gift taxes.

    (iv) Eligibility for a benefit, program or assistance under a statute or regulation.

Here, it appears that Appellee was acting as a daughter, in the best interests of her mother who conveyed to her that the 2019 Bomstein documents were the result of Martin's barrage of self-serving concerns, and, that she wanted to return to what was her intent in 2012 granting the property to Lamb. As such, even if Section 5601.3 were to apply to the 2020 deed, Lamb was carrying out her mother's wishes at the time.

16

**00658**

In 2020 Martin Dougherty was ready and willing to convey his life interest in the property when, according to him, it was to preserve his financial interests because Lamb purportedly told him such action would protect his benefits. N.T. 10/4/23 @ 151-152.

Dolores Dougherty was described by Martin as follows when it came to her financial affairs "...when it came to money..., when it came to money with my mother, she knew. Her mind was razer sharp..." *Id.* Similarly, when questioned by Attorney Qui in 2022 Dolores Dougherty responded that she handled her own financial affairs which included: "...I review my own statements. I write out my own checks. I write out my own bills...I control my own accounts. I review my own statements. I write out my own bills." *Id.* @ 64. According to the decedent's daughter, Donna Dougherty, her mother "...has a very strong personality..." N.T. 10/5/23 @ 91. Given these observations about the decedent it is difficult to accept that even with suffering a painful bout of shingles, and looking tired at the time of the 2020 documents, over the course of three meetings with Yanks that: (1) she didn't understand the nature of the documents, and (2) she would sign the documents without reading them, or having someone read the contents to her.

VI.     Jurisdiction/Orphans' Court

This matter was initiated in the Civil Trial Division of Philadelphia County primarily as a quiet title matter, and was represented as such by counsel for Appellants throughout the non-jury trial. Additionally, the litigation sought the return of the decedent's retirement money. It was not until the Court found against Appellants as to the deed that Appellants claimed the Court erred by not transferring the litigation to Orphans' Court.

During his opening to the Court, Appellants' counsel clearly stated what the case was about:

17

00659

Mr. DEMARCO:...[T]here are two issues before you...The first is our Quiet Title Action

to declare void a 2020 November transfer of the family home to one of her daughters, the

defendant, Dolores Lamb, to the exclusion of the other siblings...We have a Quiet Title

Action based on allegations of mistake, diminished capacity and undue influence inter

alia...The other issue is her retirement money, Judge...there is not a will contest before

you today.

N.T. 10/4/23 @ 15-18.


After both counsel opened, the Court inquired about Orphans' Court. Appellants' counsel

remained silent and gave no response to the Court's inquiry; and proceeded to present

Appellant's case. *Id.* @ 41-44.

Similarly, during closing arguments, the Court inquired about Orphans' Court.

Appellants' counsel responded during the exchange:


THE COURT:...The Orphans; Court action, what's going on in Orphans' Court? What is

being requested of Orphans' Court?...And basically what you are asking is that this Court

overturn the will--

MR. DEMARCO: Just the deed.

THE COURT: ...Well -- the deed would basically go into the estate. So that's -- I think

that's a key issue here for Orphans' Court.

MR. DEMARCO: The deed is out of the estate...So the deed has been removed from the

estate. All that's left for the estate is the money...


18

**00660**

N.T. 10/6/23 @ 243-244.

Appellee's counsel continued as follows:

> MR CLEMM: I'm sorry, you're right. The money is here before the Court, too. I meant just as to the real estate.
>
> MR. DEMARCO: I agree --

*Id.* @ 245.

Ultimately, the Court decided in favor of Appellee as to the deed. It was not until post-trial motions that Appellants challenged the Court's jurisdiction. Significantly, it was Appellants who initiated these proceedings in the Civil Division of the Court; and, never motioned for a transfer to Orphans' Court pre-trial or during trial. Moreover, when the Court inquired about Orphans' Court, Appellants' counsel either remained silent, or emphatically supported the Court's jurisdiction. *Id.*

Of note: Throughout these proceedings, Appellee consistently acknowledged that the $74,751 belonged to her mother. Appellee's counsel conceded that the money should be returned to the estate, and the Court so ordered. *Id.* @ 45-46. Any determinations about the money are now properly before Orphans' Court.

VII.    Surcharge

Appellants claim trial court abuse of discretion and error for failure to impose a surcharge on the $74,751 award to the estate. At the outset, the money was ordered to be held in escrow pending a dispositive order by Orphans' Court. Nothing ordered by this Court precludes what

19

**00661**

Orphans' Court deems appropriate regarding the funds. Abuse of discretion and/or trial court error are belied by the circumstances of the instant case.

As to a surcharge, Appellants cite to *Estate of Scharlach,* 809 A.2d 376 (Pa. Super 2002) which is totally distinguishable from the instant matter. A surcharge was defined as (citations omitted): "A surcharge is the penalty imposed for failure of a trustee to exercise common prudence, skill and caution in the performance of its fiduciary duty, resulting in a want of due care...." *Estate of Scharlach* concerned a bank as fiduciary, a specific Orphans' Court ordered guardianship plan and financial protocols.

Significantly, Estate of Scharlach was unlike this case involving affairs between a mother and daughter where Appellants failed to prove that the financial transactions involved power of attorney. Moreover, Appellants failed to prove that Appellee failed to act prudently in the handling of her mother's funds. For example, Appellee never claimed that her mother's money belonged to her. Also, Appellee, did what her mother directed...invested the money. Finally, when the funds decreased in value, the investment instrument was changed, and, with her own money Appellee returned the fund to its original dollar amount. N.T. 10/6/23 @ 42-46, 99-102. Given the totality of the evidence presented to this Court the imposition of a surcharge on the $74,751 was not warranted.

VIII.    Weight of the Evidence/Credibility

Appellants' issues X, XI, XII can all fall within the category of Weight of the Evidence, challenging the Court's credibility determinations.

We end, where we began, as in this Court's view credibility determinations are the key to untangling the torturous course of Dolores Dougherty's estate planning, particularly as to what is before this Court...the 2020 deed. A Weight of the Evidence claim requires the following:

20

**00662**

Appellate review of a weight of the evidence claim is a review of the [trial court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the last assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Haan v. Wells*, 103 A.3d 60, 70 (Pa. Super. 2014).

Here, this Court, sitting non-jury, heard all of the evidence and evaluated witness credibility over the course of many days. The testimony of Attorney Bomstein (who prepared documents a year prior), Attorney Qui (who prepared documents a year later) and siblings (not present and had no direct knowledge of 2020 events) were incidental to and did not bolster the credibility of Martin. The testimony of the witnesses for Appellant had nothing to do with 2020 activities and intentions, but related to real time intentions and events in 2019, 2021 and 2022. Doctor Carabello's testimony confirmed the decedent's lengthy, painful bout with shingles at the time of the 2020 deed; however, that was an issue never in dispute. So again, the real credibility issue lies between the battling siblings.

There were several credibility red flags as to Martin's testimony. One example points to Martin's selective memory regarding the documents he witnessed. He acknowledges his signature as a witness on the 2012 and 2020 documents but asserts ignorance as to the contents of each, along with that of his mother. According to Appellants, Martin was more than willing,

21

00663

when according to him he gave up his life interest in 2020 thinking it was a will. However, Martin also disputed that he would have done so if he knew it was a deed??? This argument makes no sense! Similarly, it is incredible that Martin knew every detail of the 2019 documents, and read the contents to his mother. Yet, when his mother was in such pain and discomfort he failed to read the documents, let alone read them to his mother. The Court found Martin's trial testimony to be as self-serving as were his interactions and influence over his mother's affairs.

It is certainly plausible that Mother Dougherty reached out to Lamb, someone she trusted, to complain about Martin's bombardment about the estate and the impact upon him, and the change made in 2019. Equally plausible, the mother wanted control of the property with Lamb thinking she would make decisions about the property that would benefit Martin. N.T. 10/6/23 @ 63, 67, 126. Martin continues to live in the Jackson Street property, doesn't pay rent and Appellee financially maintains the property. *Id. @* 128.

## CONCLUSION

For the foregoing reasons, appellate relief should not be afforded Appellants.

**BY THE COURT:**

_____
GWENDOLYN N. BRIGHT, J.
DATE: 7/9/24

22

**00664**

## CERTIFICATE OF SERVICE

I, Richard C. DeMarco, certify that on August 16, 2024, I filed the within

Reproduced Record via the Commonwealth Court's e-filing system, satisfying Rule

121 of the Rules of Appellate Procedure, and mailed, by first class mail, two copies

of the Reproduced Record upon the following parties:

Mark C. Clemm, Esquire; Katie M. Clemm, Esquire
CLEMM AND ASSOCIATES, LLC
488 Norristown Road, Suite 140
Blue Bell, PA 19422
(484) 539-1300
mclemm@clemmlaw.com
kclemm@clemmlaw.com

/s/Richard DeMarco
Richard C. DeMarco, Esquire